IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DONNA GREENLEE,                    )    Civil No. 3:11-cv-00014-JE
                                   )
                    Plaintiff,     )    FINDINGS AND
                                   )    RECOMMENDATION
        v.                         )
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
                    Defendant.     )
_____)

        Tim D. Wilborn
        Wilborn Law Office, P.C.
        P.O. Box 2768
        Oregon City, OR 97045

            Attorney for Plaintiff


        S. Amanda Marshall, U.S. Attorney
        Adrian L. Brown, Asst. U.S. Attorney
        1000 S.W. 3rd Avenue, Suite 600
        Portland, OR 97204-2902

FINDINGS AND RECOMMENDATION - 1

Kathryn Ann Miller
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

Jose R. Hernandez
Social Security Administration
1301 Young Street, Suite A702
Dallas, TX 75202

       Attorneys for Defendant

JELDERKS, Magistrate Judge:


Plaintiff Donna Greenlee brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a decision of the Commissioner of Social Security (the Commissioner)

denying her application for Social Security Disability Insurance Benefits (DIB) under the Social

Security Act (the Act).

For the reasons set out below, the Commissioner's decision should be reversed and the

action should be remanded to the Social Security Administration (the Agency) for an award of

benefits.


## Procedural Background

Plaintiff filed an application for DIB on June 20, 2007, alleging that she had been

disabled since May 15, 2007 because of fibromyaligia; chronic left neck and shoulder pain;

bilateral carpal tunnel syndrome, shoulder, elbow, and knee injuries; and a history of joint

problems.  The application was denied initially on June 20, 2007, and upon reconsideration on

April 22, 2008.


FINDINGS AND RECOMMENDATION - 2

Pursuant to Plaintiff's timely request, a hearing was held before Administrative Law Judge (ALJ) Marilyn Mauer on March 26, 2010.  In a decision dated April 27, 2010, ALJ Mauer found that Plaintiff was not disabled within the meaning of the Act.  That decision became the final decision of the Commissioner on November 18, 2010, when the Appeals Council denied Plaintiff's request for review.

In the present action, Plaintiff seeks judicial review of that decision.

## Factual Background

Plaintiff was born on October 5, 1961, and was 51 years old at the time of the hearing before the ALJ.  She has a high school education, and has past relevant work experience as a medical receptionist.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant

has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

FINDINGS AND RECOMMENDATION - 4

At Steps One through Four, the burden of proof is on the claimant.  <u>Tackett</u>, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  <u>Id.</u>

## **Medical Record**

An MRI of Plaintiff's cervical spine taken on October 9, 2000 showed C5-6 paracentral/medial foraminal disc herniation, mild to moderate foraminal stenosis, mild disc space narrowing at C5-6, disc desiccation from C2-3 to C5-6, and mild reversal of normal cervical lordosis.  An MRI of Plaintiff's cervical spine taken on January 9, 2002 showed hardware from a fusion of C5-6 and small, unchanged posterior annular bulges at C3-4 and C4-5.

A Doppler study of the arteries of Plaintiff's upper extremities was conducted on March 20, 2006 in an attempt to determine the cause of pain that Plaintiff had been experiencing for three years in her left neck, shoulder, and arm.  The study showed that provocative maneuvers appeared to precipitate significant arterial compromise in a number of positions on both sides, suggesting possible thoracic outlet syndrome.  Dr. Jonathan Hill, the examining physician, noted that Plaintiff had elevated blood pressures in both arms and modest fullness in the left side of Plaintiff's neck.  He found markedly decreased pulse in Plaintiff's left brachial and radial arteries which disappeared when the arm was elevated above Plaintiff's head.

In notes of a consultation dated April 17, 2006, Dr. Hill indicated that Plaintiff had undergone multiple surgeries on her neck and shoulder.  He recommended that a CT scan be performed on the left arm and neck to confirm abnormalities in the subclavian artery system, to be followed by surgery if appropriate.  On April 25, 2006, Dr. Hill performed left first rib resection surgery to treat a diagnosed thoracic outlet syndrome.  A CAT scan taken on June 23,

2006 showed soft tissue thickening of the musculature surrounding the first rib on the left side, which the reviewing doctor thought could be scar tissue or a hematoma resulting from the rib resection surgery.

During an examination on August 7, 2006, Dr. Donald Olson noted that Plaintiff's left shoulder was elevated, and that there was tenderness on deep palpation. He stated that Plaintiff had a pain syndrome that was not clearly understood.

An MRI of Plaintiff's cervical spine taken on August 10, 2006 showed a possible osteophyte, hardware fragment, or disc fragment that was projecting into the spinal canal. Mild bilateral degenerative neural foraminal narrowing at C4-5 and mild degenerative disc disease at C4-5, C3-4, and C4-5 were also noted. In notes dated August 14, 2006, Dr. Olson opined that a surgical hardware from Plaintiff earlier fusion might have migrated and caused Plaintiff's pain and swelling on the left side. After a follow-up CT ruled out that possibility, Dr. Olson opined that a small bone spur at C5 might have been causing Plaintiff's pain. He performed cervical facet injections on Plaintiff's spine on September 25, 2006. On October 16, 2006, Dr. Olson noted that the injections had not provided relief, and that Plaintiff's pain was worsening. On November 11, 2006, he suggested that electrical stimulation should be the next step in Plaintiff's treatment.

Chart notes dated March 1, 2007 indicated that the medications that had been prescribed were not providing sufficient relief for Plaintiff's chronic neck pain. Notes dated April 18, 2007 indicated that Plaintiff reported that she had experienced increased neck pain since being involved in an automobile accident a few days earlier. An x-ray of Plaintiff's cervical spine taken on April 24, 2007 showed mild degenerative changes at C4-5 with slight disc space narrowing and mild bilateral neural foraminal narrowing caused by uncovertebral spurring. An

EMG study of Plaintiff's right arm performed on May 18, 2007 revealed moderately severe carpal tunnel syndrome.  There was no evidence of cervical radiculopathy, brachial plexopathy, or other mononeuropathies affecting Plaintiff's right upper extremity.

Dr. Paul Puziss examined Plaintiff's left shoulder on May 31, 2007.  Dr. Puziss noted that Plaintiff was left handed, had a history of multiple surgeries and physical therapy, and had carpal tunnel syndrome in her right arm.  Plaintiff reported that she had been having temporal/occular headaches and had continual pain in her left shoulder and the left side of her neck.  Dr. Puziss found no evidence of thoracic outlet syndrome and opined that the chronic swelling over Plaintiff's lower left scalenes might be alleviated with physical therapy.  He opined that Plaintiff's shoulder did not require "specific treatment."

Dr. John Nutt examined Plaintiff on June 25, 2007.  He noted that fullness in the left scalene and left trapezius muscles gave Plaintiff's neck an asymmetrical appearance.  Dr. Nutt noted that deep palpation, particularly over the scalene muscles, trapezius, and levator scapulae on the left caused discomfort.  Plaintiff's gait was "entirely normal," and she had full range of motion and strength in her neck.  Dr. Nutt diagnosed cervicalgia, opined that Plaintiff's pain could be related to earlier surgeries, and recommended treating Plaintiff's symptoms with botulinim toxin injections.

Dr. Robert Zirschky examined Plaintiff's left arm on December 14, 2007.  He opined that Plaintiff had refractory lateral epicondylitis of the left elbow, and performed surgery to repair that condition one week later.

Dr. Deborah Syna examined Plaintiff on March 19, 2008.  She noted Plaintiff's continuing problems with left-side neck pain, left shoulder and arm pain, and headaches.  Dr. Syna reported that Plaintiff had previously had surgical reconstruction to repair a tear in her left

FINDINGS AND RECOMMENDATION - 7

rotator cuff, and had experienced severe pain in her left eye, posterior neck, and left shoulder after the immobilizing sling was removed a few weeks later. She indicated that Plaintiff continued to have constant pressure on her left neck, with change in the prominence of her clavicle and elevation of her left shoulder. Dr. Syna stated that the surgery performed to repair Plaintiff's diagnosed thoracic outlet syndrome in 2006 had not controlled Plaintiff's symptoms. On examination, Dr. Syna noted that hypertrophy of the left scalene muscles caused elevation of the superior scapula. She opined that Plaintiff had cervical dystonia, and that though thoracic outlet syndrome was possible, it was unlikely. Dr. Syna recommended botulinum toxin injections and Klonopin to help Plaintiff sleep.

On May 15, 2008, Dr. Rebecca Ricoy began treating Plaintiff for a mood disturbance related to chronic pain.

Dr. John French examined Plaintiff on May 19, 2008. He noted that Plaintiff reported continued left shoulder pain, fatigue, and a sensation of pressure behind the left eye. On examination, Dr. French found that Plaintiff's muscles were tight and tender in the pectoralis, upper trapezius, and rhomboid areas, and that Plaintiff had some fullness in the supraclavicular fossa. He diagnosed myalgia with myositis unspecified, chronic. Dr. French indicated that Plaintiff had chronic left shoulder pain with "a significant myofascial component." He added that extensive evaluations by numerous specialists had not revealed "treatable problems." Dr. French indicated that he supported Plaintiff's plan to continue to wean herself from OxyContin, noting that she was taking "chronic narcotics for nonmalignant pain . . . ." He added that it was "not clear what pathology is being treated at this point . . . ." Dr. French stated that he supported Plaintiff's plan to "see a psychiatrist" and indicated that he would "also offer a trial of biofeedback relaxation training to see if we can afford some symptomatic relief."

In a visit to Dr. Zirschky on June 6, 2008, Plaintiff complained of pain in her right shoulder and right ankle.  Dr. Zirschky indicated that these were "new problems," and noted that Plaintiff had minor swelling on the left side of her neck.  He opined that Plaintiff had some AC strain and arthritis in the right shoulder and peroneal tendinitis in the right ankle.  On June 12, 2008, Dr. Zirschky injected Plaintiff's right AC joint with cortisone.

Beginning in June, 2008, Plaintiff had occupational therapy and physical therapy for her left shoulder and neck pain through Salem Hospital.  Electrical stimulation with a TENS unit did not relieve Plaintiff's pain.  Physical therapists noted that the keyboarding position was particularly painful for Plaintiff.  Plaintiff was taking Cymbalta for mood and pain issues.  An MRI of Plaintiff's right ankle taken on July 16, 2008 showed tears in several tendons and ligaments.

On July 24, 2008, Dr. Ricoy, Plaintiff's treating psychiatrist, reported that Plaintiff was struggling with feelings of worthlessness, and that Plaintiff said that her pain and fatigue prevented her from completing activities of daily living.

On July 29, 2008, Dr. Malcolm Snider opined that surgery was not the best option for treating Plaintiff's chronic right ankle sprain.

On August 18, 2008, Plaintiff's physical therapists noted that physical therapy provided only temporary relief for Plaintiff's neck and shoulder pain, and on August 26, 2008, Dr. Ricoy noted that treatment had not altered Plaintiff's mood and pain issues.

On September 5, 2008, Plaintiff's physical therapists noted continued tightness in Plaintiff's left scapular area.  On September 9, 2008, Dr. French noted that Plaintiff's physical therapists were frustrated with Plaintiff's lack of progress, and that therapy had not relieved Plaintiff's pain.  He also stated that, though he would be happy to continue to work with Plaintiff

FINDINGS AND RECOMMENDATION - 9

if "further treatable conditions" were identified, his efforts to help improve Plaintiff's symptoms had been unsuccessful.

On September 10, 2008, Plaintiff had injections in the AC joint of her right shoulder and in her right knee. She had four more injections in her right knee during the next 30 days.

In a letter dated October 14, 2008, physicians from the OHSU genetic clinic opined that Plaintiff's history of joint symptoms indicated that Plaintiff had the hypermobility type of Ehlers-Danlos Syndrome, a connective tissue disorder. The doctors recommended that Plaintiff seek assistance from a pain management clinic and have physical therapy.

Catherine Wilson, an occupational therapist, evaluated Plaintiff's physical capacities on November 11, 2008. Ms. Wilson found that Plaintiff could lift 5 pounds occasionally, 10 pounds infrequently, and 15 pounds no more than twice a day; that Plaintiff needed 5 minute breaks in a supine position to rest her neck muscles; could sit with a head rest for 1 hour at a time, up to 4- 5 hours per day; could sit without a head support for 30 minutes at a time up to 3 hours a day; could stand for 10 minutes at a time up to 1 hour per day; and could walk for 20 minutes at a time, up to 2 hours a day. She also found that Plaintiff's pain increased with movement and repetitive motion, especially with resistance.

An MRI of Plaintiff's cervical spine taken on November 12, 2008 showed mild right-sided foraminal narrowing at C4-5 secondary to joint of Luschka hypertrophy. A SPECT bone scan taken on the same date showed intense activity in Plaintiff's right AC joint, which was thought to be the likely result of degenerative disease.

Dr. Zirschky examined Plaintiff's right shoulder on November 20, 2008. He noted that Plaintiff had undergone multiple orthopedic surgeries, had been diagnosed with Ehlers-Danlos Syndrome a short time earlier, and had a pain disorder. Dr. Zirschky found marked tenderness in

Plaintiff's right AC joint, and opined that Plaintiff had AC arthrosis and impingement in the right shoulder.  On November 25, 2008, Dr. Zirschky performed distal clavicle resection and subacromial decompression surgery on Plaintiff's right shoulder.

Dr. Ahmed Ebeid examined Plaintiff on March 24, 2009.  He noted that Plaintiff had been diagnosed with Ehlers-Danlos Syndrome, and had chronic neck and shoulder pain.  Dr. Ebeid suggested that Plaintiff consider receiving a series of injections, start methadone therapy and wean from other medications, and receive electrical stimulation.

Melissa Coombs, a Physician's Assistant, examined Plaintiff's right knee on April 29, 2009.  She opined that Plaintiff had osteoarthritis and prescribed a lateral unloading brace and physical therapy exercises.  Plaintiff also had physical therapy for her left-sided neck pain from April 2, 2009 through May 6, 2009, which provided  only temporary relief of Plaintiff's symptoms.

An arterial study performed on May 15, 2009 showed that Plaintiff had asymptomatic flow obstruction in her upper extremities with her arms overhead and a pressure differential between Plaintiff's left and right brachial arteries.

On May 26, 2009, Dr. Zirschky examined Plaintiff's right knee and diagnosed a probable meniscal tear.

On July 17, 2009, Dr. Ebeid again examined Plaintiff, and noted swelling in the left side of her neck.

On August 6, 2009, Dr. Snider opined that Plaintiff's right knee pain was caused by degenerative joint disease.  He also diagnosed flexor tendinitis in Plaintiff's left hand.

On September 8, 2009, Dr. Mark Patton examined Plaintiff. He noted that she appeared to have a blunted affect and, despite the antidepressant medications she was taking, appeared depressed.

During a visit to Dr. Zirschky on November 3, 2009, Plaintiff complained of a stabbing pain in her right foot. Dr. Zirschky noted the presence of a firm mass in the foot.

Dr. Ricoy continued to provide counseling for Plaintiff through November, 2009. She noted that Plaintiff was hypersensitive to stress and that her medications caused significant side effects, including mental fogginess.

Plaintiff sought treatment at an emergency room on November 9, 2009, with complaints of chest pain and shortness of breath. She had mentioned these symptoms during an appointment with another doctor that day, and was advised to go to the emergency room after an elevated troponin-T test. Based upon a coronary angioraphy, left ventriculograpy, and an evaluation of the aortic root and ascending aorta, Dr. Kamram Ghalili opined that Plaintiff had no obvious coronary artery disease and no aortic insufficiency. Dr. Ghalili found that Plaintiff's EKG was essentially normal with mild thickening of the mitral leaflets, and opined that coronary spasm could not be ruled out. Plaintiff was treated with intravenous medication and released.

MRIs of Plaintiff's right leg taken on November 20 and November 23, 2009 confirmed the presence of a neuroma in the third intermetatarsal space of Plaintiff's right foot.

A polysomnography study conducted on December 14, 2009 showed that Plaintiff had mild obstructive sleep apenea.

Plaintiff was treated for chest pain in an emergency room on January 2, 2010 and February 21, 2010. On both occasions the treating physicians concluded that Plaintiff was not likely having a heart attack.

FINDINGS AND RECOMMENDATION - 12

In a chart note dated March 4, 2010, Dr. Ricoy opined that Plaintiff's depression was worsening, and noted that Plaintiff reported that she was "almost tired of fighting the battle."

Dr. Patton examined Plaintiff's shoulders and neck on March 16, 2010. He opined that Plaintiff's pain in that area was related to torticollis, a condition in which muscle spasms cause the neck to be chronically twisted. On March 22, 2010, Dr. Patton opined that Plaintiff's episodes of chest pain might be caused by cardiac spasms, and started Plaintiff on Cardizem, a medication used to treat that condition.

In a letter dated April 8, 2010, Dr. Ricoy opined that Plaintiff's chronic pain had resulted in a depressive disorder, NOS, which might best be described as a mood disorder secondary to chronic pain. Dr. Ricoy opined that Plaintiff's ability to engage in basic work-related activities on a consistent basis was "quite impaired," and that, though Plaintiff was highly motivated to return to work, she did not think that would be possible. Dr. Ricoy reported that she saw no evidence of malingering, and opined that, paradoxically, Plaintiff's desire for a cure for her chronic physical problems interfered with the psychological improvement that acceptance of her condition might bring.

After the hearing before the ALJ, Plaintiff submitted to the Appeals Council a letter dated August 3, 2010. In the letter, Dr. Patton opined that Ehlers-Danlos Syndrome, chronic pain, and joint instability prevented Plaintiff from performing physical labor on a sustained basis. Dr. Patton opined that Plaintiff was subject to unpredictable sudden episodes of pain that prevented her from making plans or carrying out a routine schedule, and would likely cause her to miss work two or more days per month.

**Hearing Testimony and Lay Witness Evidence**

**Plaintiff**

Plaintiff testified as follows at the hearing before the ALJ.

When she had last worked as a medical receptionist, she had been able to work only 2 days a week. Work had caused significant pain in Plaintiff's neck and shoulder; she had fatigued quickly and could not work at the required pace. The side effects of her medications included fatigue, constipation, and "brain fog." Plaintiff could lift 5 pounds. She could sit in a chair for about 30 minutes before needing to change positions, could stand for 20 to 30 minutes at a time, and could walk for 30 to 45 minutes at a time.

Plaintiff spent about 7 hours a day lying down and took rest breaks between running errands and doing other daily activities. Ehlers-Danlos Syndrome caused pain in Plaintiff's hands, and she had to grasp coffee cups in a particular way to keep from dropping them. Plaintiff had had to stop doing yoga because of fatigue and pain in her neck and shoulder. She walked 15 to 20 minutes twice a week for exercise, and walked her dog two or three times a week.

Because of her chronic pain, fatigue, and lack of motivation, Plaintiff had problems with anxiety and depression. Her ability to function varied unpredictably from day to day: sometimes she felt well, and other times she had to go back to bed shortly after waking up. Because she did not know in advance how much pain she would have on any given day, it was difficult to commit to social activities or a schedule. In addition to the pain she had experienced for some time in her head, neck, right knee, and right shoulder, Plaintiff had experienced several episodes of chest pain related to cardiac spasm during the last few months before the hearing.

**Vocational Expert**

FINDINGS AND RECOMMENDATION - 14

The ALJ posed a vocational hypothetical describing an individual who could lift 20 pounds occasionally and 10 pounds frequently; could stand and walk in combination for up to 4 hours in an 8 hour work day; needed the option to sit or stand at will; could sit for up to 6 hours in an 8 hour work day; could not reach overhead or ever crawl or climb ladders, ropes, or scaffolds; could climb ramps and stairs frequently; and could crouch, kneel, stoop, and bend occasionally.  The VE testified that such an individual could perform Plaintiff's past relevant work as a medical receptionist as Plaintiff had performed the work.

The ALJ then modified the hypothetical, limiting the lifting capability to 10 pounds occasionally and less than 10 pounds frequently.  The VE testified that the individual described could still perform Plaintiff's past work.

When the ALJ further modified the hypothetical to allow only for 1 to 3 step tasks, the VE testified that the individual described could not perform Plaintiff's past receptionist work, but could work as a stuffer, eyeglass frame polisher, and film touch-up inspector.  The VE further testified that the need to lie down for 20 to 30 minutes at unpredictable intervals or more than 2 absences per month would preclude employment.

**Lay Witness Statement**

Shirley DeShon, Plaintiff's friend, wrote a letter dated February 16, 2010, describing her observations of Plaintiff's limitations as follows.  Several years earlier Plaintiff had been very active: She had engaged in a variety of vigorous athletic activities, and had been able to work full time, travel, and care for her home and garden.  Plaintiff could no longer carry out these activities.  Plaintiff had not seemed to recover from a surgery performed seven years earlier, and

her neck, shoulder, arm and face were swollen.  She was in constant pain and had little energy. Plaintiff could not go shopping for an hour without resting, and on some days lacked the energy to get off the couch.

**ALJ's Decision**

At the first step of her disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability on May 15, 2007.

At the second step, the ALJ found that Plaintiff had the following severe impairments: residual cervical pain, status post fusion; right knee degenerative joint disease; right carpal tunnel syndrome; right foot neuroma; and Ehlers-Danlos Syndrome.

At the third step of her analysis, the ALJ found that Plaintiff's impairments, alone or in combination, did not meet or medically equal a presumptively disabling impairment included in the "listings," 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

The ALJ next evaluated Plaintiff's residual functional capacity (RFC).  She found that Plaintiff had the functional capacity required

> to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk four hours in an eight hour workday, and sit for unrestricted amounts of time with the option to alternate her position at will.  She is precluded from climbing ladders, ropes, and scaffolds and from crawling.  Ms. Greenlee should crouch, kneel, stoop, and bend no more than occasionally.  She is not able to reach overhead.  She is limited to frequent, not constant, grasping with her non-dominant right hand.  She should avoid all exposure to workplace hazards due to her use of narcotic pain medications.

In evaluating Plaintiff's RFC, the ALJ concluded that, though Plaintiff's medically determinable impairments could reasonably be expected to produce some of the symptoms

FINDINGS AND RECOMMENDATION - 16

Plaintiff described, her allegations concerning the intensity, persistence, and the limiting effects of her symptoms were not credible to the extent they were inconsistent with the above RFC assessment.

At the fourth step of her analysis, the ALJ found that Plaintiff could perform her past relevant work as a medical receptionist, as she had performed the work.

Though the conclusion that Plaintiff could perform her past relevant work made it unnecessary to do so, the ALJ also evaluated Plaintiff's capacity to perform other work at step five. Based upon the VE's testimony, the ALJ found that Plaintiff could work as a stuffer, eyeglass frame polisher, or film touch up inspector.

Based upon her conclusion that Plaintiff could perform her past relevant work and could perform other jobs that existed in substantial numbers in the national economy, the ALJ found that Plaintiff was not disabled within the meaning of the Act.

## **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.

FINDINGS AND RECOMMENDATION - 17

42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or

detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir.

1986).  The Commissioner's decision must be upheld, however, even if "the evidence is

susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ erred in concluding that her mental impairments were not

"severe," improperly rejected the opinion of her treating doctor and occupational therapist, erred

in finding that she was not wholly credible, failed to properly support her rejection of evidence

from a lay witness, and erred in finding that Plaintiff could perform her past work and other jobs

that existed in substantial numbers in the national economy.

## 1. Finding That Plaintiff's Mental Impairments Were Not Severe

The "severity" analysis at step two of the disability determination process "is a de

minimis screening device to dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273,

1290 (9th Cir. 1996) (citing Bowen v. Yuckert, 482 U.S. 137, 153-54 (1987); SSR 85-28;

Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988)).  An impairment is 'not severe' if the

evidence establishes that it has "no more than a minimal effect on an individual's ability to

work."  Id.

Plaintiff contends that the ALJ erred in concluding that her depressive disorder was not a "severe" impairment.  I agree.  Dr. Ricoy, Plaintiff's treating psychiatrist, diagnosed Plaintiff with a depressive disorder, NOS, which she opined was related to Plaintiff's chronic pain.  The ALJ discounted the severity of Plaintiff's mental impairments on the grounds that her depressive disorder resulted from pain, and concluded that it resulted in no more than mild functional limitations.

The Commissioner now asserts that the ALJ's assessment was well founded because it was not possible to fully distinguish between the effects of Plaintiff's physical and mental impairments.  However, as Plaintiff correctly notes, it is the effect, rather than the source, of Plaintiff's depression which determines whether Plaintiff's mental impairments are "severe" for the purposes of the disability analysis.  The medical record fully supports Plaintiff's assertion that her depressive disorder  more than minimally affects her ability to work.  Dr. Ricoy opined that Plaintiff's depression contributed to Plaintiff's fatigue and difficulties performing activities of daily living and basic work activities, and that opinion is consistent with other evidence in the medical record.  The ALJ set out no substantial basis for rejecting Dr. Ricoy's uncontroverted opinion as to the existence and effects of Plaintiff's depressive disorder.[1]

As Plaintiff correctly notes, a VE's testimony in response to a hypothetical that does not include all of a claimant's impairments lacks evidentiary value.  E.g., Russell v. Sullivan, 930 F.2d 1443, 1455 (9th Cir. 1991).  The ALJ here should have found that Plaintiff's depressive disorder was severe, and should have included limitations related to that disorder in her

---

[1] Though non-examining state disability medical consultants opined that Plaintiff did not have severe mental impairments, the opinion of a nonexamining physician does not constitute substantial evidence contradicting the opinion of a treating or examining physician.  E.g., Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).

assessment of Plaintiff's RFC and in her vocational hypothetical.  In the absence of any

limitations based upon Plaintiff's depressive disorder, the VE's testimony that an individual with

Plaintiff's functional capabilities could perform Plaintiff's past relevant work as a receptionist

and could perform other work lacked evidentiary value.

2. **ALJ's Assessment of Evidence From Treating Psychiatrist and Therapist**

As noted above, Dr. Ricoy, Plaintiff's treating psychiatrist, opined that a combination of

mental and physical impairments significantly impaired Plaintiff's ability to consistently engage

in work-related activities, and prevented Plaintiff from returning to work.  The ALJ did not

address Dr. Ricoy's opinions in depth, but obviously rejected her conclusion that Plaintiff's

impairments were of disabling severity.  The ALJ simply observed that Dr. Ricoy's statements

indicated that Plaintiff's mental impairments were related to pain and loss of physical

functioning, and the ALJ concluded that Plaintiff's mood disorder itself caused only mild

limitations.

Plaintiff contends that the ALJ did not provide legally sufficient reasons for rejecting Dr.

Ricoy's opinion as to the severity of Plaintiff's combined mental and physical impairments.  I

agree.

Because treating physicians have a greater opportunity to know and observe their

patients, their opinions are given greater weight than the opinions of other physicians.

Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must provide clear and

convincing reasons for rejecting a treating physician's uncontroverted opinions.  Lester v. Chater,

81 F.2d 821, 830-31 (9th Cir. 1995).

The ALJ cited, and I have found, no opinions of treating or examining physicians in the

medical record that contradict Dr. Ricoy's opinion as to the severity of Plaintiff's combined

FINDINGS AND RECOMMENDATION - 20

physical and mental impairments.[2]  The ALJ was therefore required to provide clear and convincing reasons for rejecting Dr. Ricoy's opinion.  The ALJ's assertion that Plaintiff's depressive disorder alone would cause only mild functional limitations does not meet that requirement because it does not address Dr. Ricoy's opinion as to the disabling effects of Plaintiff's combined mental and physical impairments.

The ALJ likewise failed to provide sufficient reasons for discounting the results of the evaluation of Plaintiff's physical capacities performed by Catherine Wilson, an occupational therapist, on November 11, 2008.  As noted in the summary of the medical evidence above, Ms. Wilson found that Plaintiff could lift 5 pounds occasionally, 10 pounds infrequently, and 15 pounds no more than twice a day; that Plaintiff needed 5 minute breaks in a supine position to rest her neck muscles; could sit with a head rest for 1 hour at a time, up to 4- 5 hours per day; could sit without a head support for 30 minutes at a time up to 3 hours a day; could stand for 10 minutes at a time up to 1 hour per day; and could walk for 20 minutes at a time, up to 2 hours a day.  She also found that Plaintiff's pain increased with movement and repetitive motion, especially with resistance.

Ms. Wilson assessed functional limitations far more significant than those set out in the ALJ's RFC evaluation and vocational hypothetical.  The ALJ gave "little weight" to Ms. Wilson's evaluation on the grounds that the records did not indicate "what tests were performed or how the limitations provided were reached."  She added that, nevertheless, "the majority of the limitations identified have been accommodated in the residual functional capacity" set out in her decision.

---

[2]As noted in footnote one above, the opinion of a nonexamining physician does not constitute substantial evidence contradicting the opinion of a treating or examining physician.

The ALJ's RFC assessment did not accommodate most of the limitations that Ms. Wilson assessed, and the absence of a reference to the specific testing done does not provide a reasoned basis for rejecting the occupational therapist's assessment. If she was unsure as to the basis for the results, the ALJ could have asked Plaintiff about the testing at the hearing, or could have developed the record further as to this question. She did neither. In the absence of any basis for concluding that the occupational therapist had not performed an objective and professional evaluation, the ALJ's reliance on the lack of more detailed testing records is an insufficient basis for rejecting Ms. Wilson's assessment.

When an ALJ provides inadequate reasons for rejecting the opinion of a treating physician, that opinion is credited as a matter of law. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). A reviewing court then has discretion to remand the action for further proceedings or for a finding of disability and an award of benefits. See, e.g, Stone v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985). Whether an action is remanded for an award of benefits or for further proceedings depends on the likely utility of additional proceedings. Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000). A reviewing court should credit the evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited. Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

Here, the ALJ did not provide legally adequate reasons for rejecting the opinions of Plaintiff's treating psychiatrist and treating occupational therapist. There are no outstanding issues to be resolved before a determination of disability can be made, and it is clear from the

record that the ALJ would be required to find Plaintiff disabled if she had credited these

opinions.  Under these circumstances, this action should be remanded to the Agency for an

award of benefits.  This conclusion is supported as well by the other issues addressed in this

Findings and Recommendation, including the severity evaluation discussed above and

assessments of the credibility of Plaintiff and a lay witness discussed below.

3. **Assessment of Plaintiff's Credibilty**

The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If

a claimant produces medical evidence of an underlying impairment, the ALJ  may not discredit

the claimant's testimony concerning the severity of symptoms merely because it is not supported

by objective medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citing

Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1990)(*en banc*)).  If a claimant produces the

requisite medical evidence and there is no evidence of malingering, an ALJ must provide

specific, clear and convincing reasons, supported by substantial evidence, to support a

determination that the claimant was not wholly credible.  Thomas v. Barnhart, 278 F.3d 947,

958-59 (9th Cir. 2002); SSR 96-7p.  If substantial evidence supports the ALJ's credibility

determination, that determination must be upheld, even if some of the reasons cited by the ALJ

are not correct.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir.

2008).

An ALJ must examine the entire record and consider several factors, including the

claimant's daily activities, medications taken and their effectiveness, treatment other than

medication, measures other than treatment used to relieve pain or other symptoms, and "any

other factors concerning the individual's functional limitations and restrictions due to pain or

other symptoms." SSR 96-7. An ALJ may support a determination that the claimant was not

entirely credible by identifying inconsistencies between the claimant's complaints and the

claimant's activities of daily living. Thomas, 278 F.3d at 958-59 (9th Cir. 2002).

 As noted above, the ALJ found that Plaintiff's allegations concerning the intensity,

persistence, and limiting effects of her symptoms were not credible to the extent they were

inconsistent with the ALJ's RFC assessment. Because there was no question that Plaintiff's

impairments could be expected to cause some degree of symptoms and no evidence of

malingering, the ALJ was required to provide clear and convincing reasons, supported by

substantial evidence, for discounting Plaintiff's credibility.

 The ALJ asserted that Plaintiff was not wholly credible because her complaints of pain

were inconsistent with the objective medical evidence, which she interpreted as showing "mild"

medical conditions, and because Plaintiff was able to perform activities of daily living that

included doing household chores, walking her dog, and driving herself to the store.

 These are not clear and convincing reasons for finding Plaintiff less than wholly credible,

and they are not supported by substantial evidence in the record. The extensive medical record

shows that Plaintiff has undergone many surgeries and has aggressively, if unsuccessfully,

treated the symptoms associated with her documented medical conditions with a number of

therapies and medications. To the extent that the pain she describes might arguably be described

as inconsistent with the objective medical record, the Ninth Circuit has expressly held that such

inconsistency is not a proper basis for discounting a claimant's pain testimony. See, e.g.,

Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) (assertion that pain was "out of

proportion to the medical evidence" not valid basis for discounting testimony "since it is the very

nature of excess pain to be out of proportion to the medical evidence"). Nor were Plaintiff's

descriptions of her activities of daily living that appear in the transcript of the hearing before the ALJ and elsewhere in the record consistent with the functional capacity required for full time employment.  Plaintiff consistently described her activities of daily living as limited, sporadic, and interrupted by breaks necessitated by pain and fatigue, and the ALJ did not cite substantial evidence supporting the conclusion that Plaintiff could sit, stand, and walk for a combined total of 8 hours during a work day.

Where, as here, an ALJ improperly rejects a claimant's testimony which would require a finding of disability if believed, courts generally credit the testimony as true and remand the action for an award of benefits.  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  That is appropriate here.

## 4.  **Lay Witness Statement**

As noted above, Shirley DeShon, Plaintiff's friend, submitted a letter describing the debilitating effects of Plaintiff's intractable medical problems.  The ALJ summarized Ms. DeShon's statement, but provided no specific reasons for finding it was not wholly credible.  Instead, she simply found that the "allegations of Ms. Greenlee and third-party witnesses are not credibly supported by the weight of the evidence to the extent inconsistent with" the RFC assessment set out in her decision.

An ALJ must provide reasons that are "germane" for discounting the statements of third party witnesses.  Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).  The ALJ's assertion that Ms. DeShon's statement was not credibly supported by the weight of the evidence does not satisfy that requirement.  Ms. DeShon's description of Plaintiff's impairments was consistent with the medical evidence summarized above.

## 5.  **Ability to Perform Past Relevant Work and Other Work**

FINDINGS AND RECOMMENDATION - 25

As noted in the discussion of the ALJ's step two analysis above, an ALJ's hypothetical to a VE must set out all of a claimant's impairments and limitations.  E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The ALJ's description of the claimant's limitations must be "accurate, detailed, and supported by the medical record."  Tackett v. Apfel, 180, F.3d 1094, 1101 (9th Cir. 1999).  If the assumptions included in the vocational hypothetical are not supported by the record, a VE's opinion that a claimant can work does not have evidentiary value.  Gallant, 753 F.2d at 1456.

For the reasons discussed above, the ALJ's vocational hypothetical failed to include all of Plaintiff's mental and physical impairments and limitations.  As a result, the VE's testimony that an individual with the described functional capacity could perform Plaintiff's past relevant work and also work as a stuffer, eyeglass frame polisher, and film touch-up inspector lacked evidentiary value.

## Conclusion

A judgment should be entered REVERSING the decision of the Commissioner and REMANDING this action to the agency for an award of benefits.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due June 4, 2012.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 17th day May, 2012.


_/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge

FINDINGS AND RECOMMENDATION - 27